## COMMONWEALTH vs. JAMES L. PARKES.

No. 00-P-1334.

Essex. December 17, 2001. - February 15, 2002.

Present: GREENBERG, MASON, & DOERFER, JJ.

. *Evidence,* Hearsay. *Constitutional Law,* Confrontation of witnesses. *Lewdness.*

At the trial of a complaint charging lewd, wanton, and lascivious conduct, testimony of State troopers referring to "several cell phone calls" and to multiple "tractor-trailer units" that appeared specifically designed to put before the jury that the truck driver who reported the incident in question had not been alone in reporting the incident, rather than, as the Commonwealth contended, simply to explain the troopers' actions or to put in context the defendant's statements to the trooper at the time he was stopped, was inadmissible hearsay that should have been excluded; in the circumstances, admission of the testimony created a substantial risk of a miscarriage of justice. [817-821]

At the trial of a complaint charging lewd, wanton, and lascivious conduct, the judge did not err in denying the defendant's motion for a required finding of not guilty, where the Commonwealth's evidence was sufficient to warrant the jury's verdict beyond a reasonable doubt. [821-822]

COMPLAINT received and sworn to in the Newburyport Division of the District Court Department on May 19, 1999.

The case was tried before *Allen G. Swan,* J.

*James L. Sultan* for the defendant.

*James A. Janda,* Assistant District Attorney, for the Commonwealth.

MASON, J. After a six-person jury trial in the District Court, the defendant, James L. Parkes, was convicted of lewd, wanton, and lascivious conduct in violation of G. L. c. 272, § 53. On appeal, Parkes claims that inadmissible and prejudicial hearsay testimony was allowed in evidence and that the prosecutor made certain improper statements during her closing argument. He also claims that his motion for a required finding of not guilty, made at the conclusion of the Commonwealth's case,

should have been allowed. Because we agree that the admission of the hearsay testimony was improper and created a substantial risk of a miscarriage of justice, we reverse the conviction.

*The Commonwealth's case.* The Commonwealth introduced the following evidence at trial. Brice Guile testified that just after midnight on the morning of April 18, 1999, he was driving a large tractor-trailer truck northward on Route 95 in the area of Rowley and Georgetown. Guile was driving in the extreme right-hand lane at 62 miles per hour. While looking in his rear view mirror, Guile noticed a small two-door coupe about twelve car lengths behind him and two lanes over on his left. There were no other cars in the area.

As Guile was passing a rest area in Rowley, the coupe moved over to the lane next to him and began to draw abreast of him. Guile noticed that its interior dome light was on. Then, as the auto moved next to the driver's side window, Guile looked into the coupe and noticed that there was a small, golf ball sized ornament hanging from the car's rear view mirror and that the car had bucket seats. He then observed that the driver of the car, later identified as the defendant, was holding his exposed penis with his right hand while driving with his left. The penis appeared to be erect. Guile further observed that the defendant was wearing a light colored shirt, had his pants unbuttoned, and had folded down the corner of his pants.

After about four or five seconds, the defendant began to pull ahead of Guile. At this time, Guile braked his truck and allowed the defendant to pass him. He then noted the defendant's license plate number and used his cellular telephone to report the number to the police.

In response to Guile's call, Trooper Kelly Secrest was dispatched from the Newbury State police barracks. Secrest testified that she spotted the defendant's car traveling north on Route 95 near Salisbury and pulled it over. Shortly thereafter, Guile and another State trooper, Dana Pagley (who also testified), arrived at the scene. Guile identified himself as the person reporting the incident and thereafter returned to the Newbury barracks and provided a written statement regarding the incident.

*The defense.* The defendant testified that he had not been masturbating or doing anything else to attract attention during

the incident in question, but rather was holding a bottle of water between his legs intending to take a drink from the bottle.

More specifically, the defendant testified that, during the evening before the incident, he had attended a wedding reception in Boston with his girlfriend, Cheryl Sarokas, but then had left the reception, returned Sarokas to her apartment in Somerville, and left for his own home in New Hampshire because of nausea and stomach upset. The defendant further testified that he had taken off his belt to alleviate his discomfort and then, as he neared the tractor-trailer truck, had turned on the dome light in his car to enable him to obtain some chewable antacid tablets from a bag in the back seat. The defendant further testified that, at the time he was observed by Guile, he was holding a bottle of water between his legs and was intending to drink from the bottle as soon as he had taken the medicine. The defendant further testified that he was holding his thumb on top of the uncapped bottle in order to keep water from spilling before he had obtained the medicine.

Sarokas also testified in behalf of the defendant, stating that she had attended a wedding reception with the defendant during the evening preceding the incident. She further testified that they had left the reception and returned to her apartment in Somerville because the defendant was not feeling well, and then the defendant had left her apartment to drive to his home in New Hampshire.

1. *Improper admission of hearsay evidence.* During her direct examination of Trooper Secrest, the prosecutor elicited that, at the time Secrest stopped the defendant, she told him that she was responding to "several cell phone calls" reporting that he was "exposing himself." More specifically, Secrest testified:

Q: "What conversation did you have with the defendant?"

A: "After he gave me his license and registration, I — I advised him why I had stopped him. That — "

Q: "Was he still in the car at that time?"

A: "Yes, he was."

Q: "And what did you tell him the reason was?"

A: "I had told him that we had got several — we call them code 22 calls — they are cell — people, when people call on their cell phone — that we had gotten several cell phone calls that he was driving erratically, flashing his high beams and exposing himself to other people in traffic."

Secrest further testified that, in response to her statement, the defendant stated that he "didn't know what [Secrest] was talking about," and that "he wasn't doing that." The defendant then went on to explain that he had been feeling ill and had turned the light on in his car only to allow him to obtain some medicine from a bag in the back seat.

In response to Secrest's reference to "several cell phone calls," defense counsel brought out during his cross-examination of Secrest that there was no reference to multiple calls either in the police log or in the report Secrest had written regarding the incident. The prosecutor then elicited the following additional testimony on redirect:

Q: "Well, let me ask you this: The statement that was read from your report about what you were — what this driver was said to have been doing —"

A: "Yes."

Q: " — where did that information come from?"

A: "It came from — the code 22 caller statement?"

Q: "Yes."

A: "That came from Trooper Reddy."

Q: "So who is Trooper Reddy?"

A: "She was the desk officer."

Q: "And can you recall for us today whether one caller called in or more than one caller called in?"

A: "It was given out over the radio as numerous calls."

During her subsequent examination of Trooper Pagley, the prosecutor elicited the following additional testimony:

Q: "Let me ask you: On April 18th, 1999, just after midnight, what were you doing?"

A: "I was in the barracks at that particular hour."

Q: "Did you receive some information?"

A: "Yes."

Q: "And as a result, did you go out?"

A: "Yes, I did."

Q: "So what were you looking for when you left?"

A: "I was looking for a vehicle, supposedly was pulling up next to tractor-trailer units, exposing themselves with the dome light on inside the car."

The defendant contends that these references by the troopers to "several cell phone calls" and to multiple "tractor-trailer units" constituted inadmissible hearsay and that their admission violated his rights under the confrontation clauses of both the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. He further contends that, even though there were no objections to the testimony, its admission created a substantial risk of a miscarriage of justice, and, hence, reversal is required. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). We agree with the defendant.

The Supreme Judicial Court has explicitly recognized that testimony of the type involved in this case "carries a high probability of misuse, because a witness may relate 'historical aspects of the case, replete with hearsay statements in the form of complaints and reports' even when not necessary to show state of police knowledge." *Commonwealth* v. *Rosario*, 430 Mass. 505, 509 (1999), quoting from McCormick, Evidence § 249, at 734 (E. Cleary 3d ed. 1984). Accordingly, the court has held that such testimony is admissible only if it is based on the police officer's own knowledge, it is limited to the facts

required to establish the officer's state of knowledge, and the police action or state of police knowledge is relevant to an issue in the case. *Commonwealth* v. *Rosario, supra* at 509-510. These requirements reflect the need to keep such evidence "carefully circumscribed." *Id.* at 508.

In the present case, Guile testified that he had reported the incident to the police as soon as it had occurred. There was therefore no issue as to why Secrest had stopped the defendant's car. Moreover, even if there were such an issue, there is no apparent reason — and the Commonwealth has suggested none — why Secrest needed to refer to "several cell phone calls," rather than simply to "information," or "a call," when she was describing her conversation with the defendant at the time of the stop. Nor is there any apparent reason why Pagley had to refer to multiple "tractor-trailer units" in describing why he had been dispatched to find the defendant's car. In the circumstances, these references by the troopers to "several cell phone calls" and to multiple "tractor-trailer units" appear specifically designed to put before the jury that Guile had not been alone in reporting the defendant's self-exposure, rather than, as the Commonwealth contends, simply to explain the troopers' actions or to put in context the defendant's statements to the trooper at the time he was stopped. The testimony, therefore, was inadmissible hearsay and, hence, should have been excluded. See *id.* at 509-510, and cases cited.

We also conclude that, in the circumstances of this case, admission of the testimony created a substantial risk of a miscarriage of justice. "An error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not 'materially influence[]' the guilty verdict." *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999), quoting from *Commonwealth* v. *Freeman, supra* at 564.

In the present case, the Commonwealth's evidence against the defendant was far from overwhelming. In fact, it consisted almost entirely of Guile's testimony. While Guile was unequivocal about what he believed he had seen, he also testified that the incident occurred shortly after midnight and lasted for only four or five seconds. In the circumstances, the troopers' repeated references to additional reports that the defendant had been

exposing himself provided important corroboration for Guile's account of the incident, and may well have induced the jury to accept that account and to reject the defendant's contrary account.[1] See *Commonwealth* v. *Smith*, 47 Mass. App. Ct. 551, 557 (1999).

Moreover, while defense counsel did not object to the hearsay evidence, we cannot with fair assurance conclude, as the Commonwealth suggests, that his failure to do so was a tactical decision calculated to obtain a benefit for the defendant in the form of evidence that he later used to impeach the troopers' credibility by introducing evidence that there were not multiple calls. The troopers' credibility was of minor importance in the case. Rather, the vital issue was whether Guile's account of the incident might be believed notwithstanding his limited opportunity to observe what was occurring. In the circumstances, we do not think it plausible that defense counsel sought to obtain a benefit from allowing the troopers' testimony regarding additional complaints to be placed before the jury. The defendant could only be harmed by this evidence, and we view counsel's later efforts as damage control once it was first admitted.

We conclude, therefore, that the admission of the hearsay evidence was fatally erroneous and reversal of the defendant's conviction is required. See *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 761-762 (1995); *Commonwealth* v. *Brouillard*, 40 Mass. App. Ct. 448, 454-457 (1996).

2. *Other issues.* We reject the defendant's claim that his motion for a required finding of not guilty, made at the conclusion of the Commonwealth's case, should have been allowed. The Commonwealth's evidence was sufficient to warrant a rational jury to find beyond a reasonable doubt that the defendant had engaged in lewd, wanton, and lascivious conduct in violation of G. L. c. 272, § 53. See *Commonwealth* v. *Sefranka*, 382 Mass. 108, 117-118 (1980). Compare *Commonwealth* v. *Bishop*, 296 Mass. 459, 460-462 (1937). Because we are reversing the

---

[1] We reject the Commonwealth's assertion that the hearsay evidence failed to identify the defendant as the person who was exposing himself. As recited above, Secrest testified that she had stated to the defendant at the time she stopped him that "we had gotten several cell phone calls that he was . . . exposing himself to other people in traffic."

conviction, we need not address the defendant's claim that the prosecutor's closing argument was improper. However, we caution that prosecutors (and defense counsel) should take care to adhere to proper bounds in presenting such argument. See, e.g., *Commonwealth* v. *O'Brien*, 377 Mass. 772, 778 (1979), and cases cited.

*Judgment reversed.*

*Verdict set aside.*